No. 49,986

HOWARD R. STITH and ROBERT D. STITH, *Appellees,* v. RICHARD WILLIAMS and AVANELL WILLIAMS, his wife, *Appellants.*

(605 P.2d 86)

Opinion filed January 19, 1980.

*K. Mike Kimball,* of Hathaway & Kimball, of Ulysses, argued the cause and was on the brief for the appellants.

*Donald E. Shultz,* of Shultz & Shultz, Chartered, of Dodge City, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

HERD, J.: This action arises out of a dispute over ownership to a

strip of land in Dodge City. The record title is in plaintiffs-appellees Howard R. and Robert D. Stith. Defendants-appellants Richard and Avanell Williams claim title by adverse possession or alternatively, by boundary agreement. The trial court found for the Stiths, who are the holders of record title. The Williams appeal. We affirm the trial court.

The plat to Riverview Addition in Dodge City was filed of record July 1, 1906. Block Three is one of the blocks included within it. The block consists of 28 lots running north and south and angling to the northwest. Each lot is 125 feet long by 33 feet wide, except the lots located on the east side of the block. These lots, irregular in design, appear to contain the land left over inside the block lines after all others were symmetrically platted. The survey of the plat apparently commenced on the west side. One of these irregular shaped lots is lot 14, which is 51.9 feet wide at the north end and 47.4 feet wide at the south end. The strip of land in controversy is a part of lot 14. It measures 12.9 feet wide on the north and 7.9 feet wide on the south and runs along the west side of the lot.

In 1950, John Goldsberry owned lot 14 and Audrey Beard owned lots 11, 12 and 13. On May 20, 1950, Goldsberry conveyed the strip of land off lot 14 to Ms. Beard. She later entered into a contract to sell lots 11, 12 and 13 to Dorothy Faulkner in May of 1955. Ms. Faulkner assigned her contract to Elmer and Bonnie Thornbrugh and Audrey Beard deeded the land directly to the Thornbrughs on August 10, 1961. Appellants received a deed to lots 11, 12 and 13 from Bonnie Rall, formerly Thornbrugh, on August 4, 1972. None of the instruments from Audrey Beard mentioned the strip off the west side of lot 14.

On January 12, 1973, Howard R. and Robert D. Stith received a warranty deed from Goldsberry conveying lot 14 to them. Later, when appellees discovered Audrey Beard still owned the disputed strip of land off lot 14 they thought they owned, they confronted her and persuaded her to sell them the land. That land was purchased on January 25, 1974 and the Stiths obtained a quitclaim deed from Beard, which was duly filed of record. The Stiths are the record title holders of all of lot 14, block 13, Riverview Addition in Dodge City.

A boundary line dispute arose between the property owners in June, 1975. The Williams claimed the disputed strip as a part of

lot 13 and the Stiths claimed it through the deed they received from Audrey Beard. Failing to reach agreement, the Stiths filed a petition for injunctive relief on July 23, 1975, after the Williams began constructing a fence on the east line of the strip of land. The Williams counter-sued for quiet title and possession of the disputed strip, in addition to damages. The trial court granted plaintiffs' request for a temporary restraining order on July 23, 1975, and dissolved it on July 31, 1975. The case was tried to the court on an agreed statement of facts from which the Stiths obtained judgment. The Williams appeal.

The Williams base their claim of ownership on two theories. First, they claim title to the disputed strip under a boundary line agreement. Alternatively, they claim title by adverse possession.

The case was submitted for determination subject to stipulations and objections to: the agreed statement, the depositions of Howard and Robert Stith, Richard Williams and John Goldsberry and certain survey exhibits and photographs of the area in question. In light of the record before us, the proper standard of review, recently stated in *Crestview Bowl Inc. v. Womer Constr. Co.*, 225 Kan. 335, 592 P.2d 74 (1979), is as follows:

"When a case is submitted to the trial court on an agreed stipulation of facts and documentary evidence, this court is afforded the same opportunity to consider the evidence as the trial court.

"Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions and stipulations, the trial court has no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine *de novo* what the facts establish. [Citation omitted.]" p. 336.

See *In re Estate of Thompson,* 226 Kan. 437, 440, 601 P.2d 1105 (1979).

The entire record is before this court and our reconstruction of the facts will be revealed as we discuss each issue raised by appellants.

The Williams first claim they own the disputed strip of land as successors in title of an express boundary line agreement between the original owners of the land, who agreed the boundaries of their land stretched to the fence line. The basic principles of boundary line agreement were recently set forth in *Landrum v. Taylor,* 217 Kan. 113, 119, 535 P.2d 406 (1975), where we stated:

"Where parties by mutual agreement fix boundary lines and thereafter acquiesce in the lines so agreed upon, they must be considered as the true boundary lines between them, even though the period of acquiescence falls short of the time fixed by statute for gaining title by adverse possession.

"The owners of adjoining tracts of land may, by parol agreement, settle and permanently establish a boundary line between their lands, which, when followed by possession according to the line so agreed upon, will be binding upon the parties and their grantees. Such an agreement, followed by possession, is not obnoxious to the statute of frauds."

The Williams argue that because Audrey Beard and John Goldsberry established the boundary line at the fence this constitutes a boundary line agreement and the Williams, as successors to Beard, are entitled to consider the fence line as the east boundary of their property. That assumption would include the disputed strip of land. This claim is faulty. There is no evidence the boundary line was in dispute or unknown, requiring an express agreement by the parties. *Fritzler v. Dumler,* 209 Kan. 16, 22, 495 P.2d 1027 (1972). The record is void of evidence the parties agreed to establish a boundary line at variance with the stated boundaries set forth in the deeds to the property. John Goldsberry and Audrey Beard recognized the existence of the irregular strip of land and, rather than enter into a boundary line agreement, Goldsberry sold the land to Beard. Beard's land stretched to the former fence line not by express boundary agreement, but by deed. There is no evidence they intended to do otherwise. We find the parties established the boundary lines in this case not by mutual agreement, but by deed. The boundary lines are, therefore, to be determined by reference to the deeds and the intention of the parties as reflected by the descriptions of the properties therein. *Landrum v. Taylor,* 217 Kan. at 118.

As an afterthought, it is interesting to note Williams testified when he bought lots 11, 12 and 13 from Audrey Beard, he was to receive 99 feet of land composed of three 33 feet lots. He claimed he didn't receive that much land and argues the disputed strip off lot 14 will make up the difference. We have examined the survey exhibits provided in the record and find each of the three lots he purchased measures 33 feet across, totalling 99 feet. The Williams received the amount of land they purchased.

Now let us turn to the adverse possession argument. K.S.A. 60-503 provides:

"No action shall be maintained against any person for the recovery of real

property who has been in open, exclusive and continuous possession of such real property, either under a claim knowingly adverse or under belief of ownership, for a period of fifteen (15) years."

We note with approval the following presumptions regarding adverse possession:

"In an action involving a claim of title by adverse possession every presumption is in favor of the holder of the legal title and none is against him. The law will not allow the property of one person to be taken by another upon slight presumptions or probabilities.

"Every presumption is against the claimant and none is in his favor. The facts relied upon to establish adverse possession cannot be presumed, and presumptions will not be indulged in to establish a claim of title." 2A C.J.S., Adverse Possession § 267.

There is always a fact issue involved in considering adverse possession. When did appellants' possession commence on the disputed strip? The Williams seek to qualify for the fifteen year requirement by tacking their belief of ownership upon their predecessors in title. The tacking must reach to the Faulkners who purchased lots 11, 12 and 13 in 1955 by virtue of a real estate contract. The tacking must evidence a continuous adverse possession for the statutory period. In addition, there must be no abandonments or other interruptions between those periods of possession that might return seisin to the owner. 3 Am. Jur. 2d, Adverse Possession § 58, p. 147. Appellants argue the Faulkners were holding the disputed strip under belief of ownership.

K.S.A. 60-503 amended G.S. 1949, 60-304 *Fourth* and became effective January 1, 1964. The former statute required adverse possession to be notorious and hostile. The new statute eliminated the element of hostility as a requirement to a claim of adverse possession and recognized a claim could be based on belief of ownership, rather than holding adversely. The new statute was first construed in *Stark v. Stanhope,* 206 Kan. 428, 480 P.2d 72 (1971). The determination of the existence of good faith belief of ownership was confronted by this court in *Wallace v. Magie,* 214 Kan. 481, 522 P.2d 989 (1974). In that case the parties stipulated the property had been held in open, continuous and exclusive possession and the question before this court was whether the party had held the property under a good faith belief of ownership. In reviewing the facts and circumstances surrounding the property in question, we found the parties had sold the house located on the real estate, granted a real estate mortgage

on the premises, granted oil and gas leases on the premises, and made improvements on the property at a cost of $750.00. While the foregoing activities are not a prerequisite to the establishment of a claim of adverse possession, they do represent common acts of ownership not present in this case. The Williams must also comply with the other prerequisites of K.S.A. 60-503: an open, exclusive and continuous claim of possession. Examples of additional acts of ownership are found at 2 C.J.S., Adverse Possession §§ 33-41.

Our careful examination of the record before us reveals the following evidence: At one time, a cedar shrub, lilac bush, cellar and shed were located on the disputed strip of land. The cellar and shed overlapped onto the Williams' land. The parties stipulated the cellar had been in existence for over 20 years and at one time housed the Williams' hot water heater. There was testimony in the form of deposition from Williams that he and his wife used the cellar and shed only occasionally as a storage area. Howard Stith testified the disputed strip of land had been used for some time by several neighboring property owners as a trash dump. He stated he and his son and grandson hauled three truck loads of rubbish from the land, after they purchased the land from Ms. Beard. The Williams offered evidence, objected to by the Stiths, which appears to establish that if Dorothy Faulkner were called to testify, she would state that the fence was claimed to be the boundary line and that there had been sufficient room between the house located on lot 13 and the fence for her to park an automobile. The Williams offered opinions that they believed Ms. Beard intended to deed all her land to the Faulkners, and that the Faulkners, the Thornbrughs and finally the Williams, thought they had purchased all the land up to the fence.

We cannot find, from a review of the foregoing evidence, that there was open, exclusive, continuous possession under belief of ownership by the Williams and their predecessors. The evidence shows the use of the land was not exclusive, nor was it continuous. Without additional, solid evidence of the use and belief of ownership of the strip of land by the Williams and their predecessors, adverse possession will not lie.

We hold appellants have failed in their burden to prove ownership of the disputed strip of land by adverse possession or boundary line agreement. In addition, after an examination of the

record, we find the facts do not support appellants' claim for damages. We have considered appellants' remaining issues on appeal and, in light of the foregoing holding, find them to be without merit.

The judgment of the trial court is affirmed.

FROMME, J., not participating.

McFARLAND, J., dissenting: I must dissent from the result reached by the majority. As stated in the majority opinion, the case was tried on written and documentary evidence, which places the appellate court in a position to determine the facts on a de novo basis. We are concerned with Lots 13 and 14 in a 1906 plat. Lot 13 is irregularly shaped, with its boundary with Lot 14 being at an angle to the street rather than a vertical line intersecting the street. In 1940, Mr. Goldsberry purchased Lot 14 and in 1945 Mrs. Beard purchased Lot 13. In 1952, Mrs. Beard purchased enough of a strip off of Lot 14 to straighten the boundary line so that the line was vertical to the street. This made the boundary line between the Beard and Goldsberry property conform to an existing fence.

In 1955, Mrs. Beard conveyed what she thought was her entire interest in the tract to the Faulkners. She forgot about the strip being an additional tract. The property description in the contract for sale was copied from Mrs. Beard's original deed (Lot 13) and, accordingly, did not describe the strip from Lot 14. Mrs. Faulkner's statement was that the land they purchased went to the fence.

The Faulkners assigned their contract to the Thornbrughs, who received a deed directly from Mrs. Beard. The deed made no mention of the strip. In 1972, the appellants (Williams) purchased Lot 13 from Thornbrugh and the same property description (Lot 13) is in the deed.

In 1973, the appellees (Stiths) received a deed to Lot 14, less the strip. Later, when the Stiths hired a surveyor for a different matter, the surveyor reported to the Stiths that the strip was still owned by Mrs. Beard. Mrs. Beard, then an elderly nursing home resident, was contacted by the Stiths relative to the strip. She denied ownership of the strip, stating all interest had been previously conveyed. Subsequently, she received a tax statement for

the strip (the first in the twenty years since her conveyance of Lot 13). She finally executed a quitclaim deed to the strip to the Stiths after a stipulated "considerable badgering" by the Stiths and Orville Brehm (Stith's real estate agent).

The Williams' house is just a few feet from the edge of Lot 13—in fact, the new Stith building is only eight feet from the Williams' home. The Williams had a root cellar and a shed partially on the strip and had been using the strip. The Stiths took unfair advantage of their accidentally acquired knowledge that Mrs. Beard's conveyance of her property was incomplete and, in effect, "got something for nothing" by "badgering" an elderly lady. I would reverse and enter judgment for the appellants.